United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

AARON KILLGORE,

Plaintiff,

v.

SPECPRO PROFESSIONAL SERVICES, LLC,

Defendant.

Case No. 5:18-cv-03413-EJD

**ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Re: Dkt. No. 33

This case arises from the employment relationship between Plaintiff Aaron Killgore (employee) and Defendant Specpro Professional Services ("SPS") (employer). Defendant moves for summary judgment as to the first and forth causes of action within Plaintiff's complaint: (1) wrongful termination in violation of California's whistleblower protections and (4) wrongful termination in violation of public policies. Having considered the Parties' briefs and having had the benefit of oral argument on December 19, 2019, the Court **GRANTS** Defendant's motion.

## I. BACKGROUND

### A. Factual Background

#### 1. Conroe Environmental Assessment

Plaintiff is an environmental compliance professional who worked for Defendant from June 2015 until June 22, 2017 (the date of his termination) as a program manager. Declaration of Geoffrey C. Lyon ("Lyon Decl."), Ex. A ("Killgore Depo.") at 68, Dkt. 37; *Id.*, Ex. B ("Emerson Depo.") at 17, 70. He was subsequently promoted to senior program manager. Reply Declaration of Denise Tran-Nguyen ("Reply Tran-Nguyen Decl."), Ex. D ("Emerson Depo.") at 18.

Whenever the federal government proposes to use land in the United States, it must

comply with a host of federal environmental statutes and regulations. Defendant, an environmental and facilities services firm, entered into a renewable, one-year contract with the United States Army Reserve ("USARC") to provide various environmental and training support services for the 63rd Regional Support Command. Declaration of Will Emerson ("Emerson Decl.") ¶ 4, Dkt. 33. One of the projects under contract involved preparing a final Record of Environmental Consideration ("REC") for a proposed action by the 1-158th Assault Helicopter Battalion ("AHB"). *Id.* ¶ 5. The 1-158th AHB is an Army Reserve Unit that operates out of the Conroe Army Reserve Center, located within the Conroe-North Houston Regions Airport in Conroe, Texas. *Id.*, Ex. A at 22. The 1-158th AHB planned to modify 12 landing sites located on Texas Department of Criminal Justice ("TDCJ") land. *Id.* ¶ 5. In connection with the REC required for the change to the landing sites, Defendant and the 63rd Command evaluated potential effects on air quality, storm water, noise, natural resources, cultural resources, and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") compliance at the Conroe, Texas Location. Declaration of Laura Caballero ("Caballero Decl."), Ex. A at 5–6, Dkt. 33. The REC was finalized in early March 2017. *Id.* at 8.

Around April 2017, after the REC was completed, the 63rd Command asked Defendant to prepare an Environmental Assessment ("EA") for a time-sensitive helicopter training for the 1-158th AHB in Conroe, Texas (the "Conroe EA"). Emerson Decl. ¶ 7. This project planned to designate 8 landing zones as Army Reserve local training areas, which triggered the need to prepare the "Conroe EA." *Id.*, Ex. A at 22. An initial step in preparing the Conroe EA involved writing the Description of Proposed Alternatives ("DOPAA"), which is a "subset of an EA" and "the first two chapters of the environmental assessment." Summary Judgment Declaration of Denise Tran-Nguyen ("SJ Tran-Nguyen Decl."), Ex. E ("Russ Depo.") at 19, 31. Defendant subcontracted with AGEISS, Inc. ("AGEISS"), an environmental services firm that specializes in assisting federal agencies. Emerson Decl. ¶ 7. Melissa Russ, an employee of AGEISS, testified that AGEISS managed and prepared most of the Conroe EA, except for the biology and cultural sections. Ex. E, Russ Depo. at 34–36.

The Conroe EA was finalized and completed five months later, in September 2017. Emerson Decl. ¶ 9. As part of the EA drafting process, Defendant and AGEISS contacted federal, state, and local agencies located in the counties surrounding Conroe. *Id.*, Ex. A at 98. The surrounding agencies were informed of the change in land use at Conroe. *Id.*, Ex. A at 121 ("Up to this point, no landing was required due to the mission training sets. Now; however, additional land is needed to perform mission tasks that require landing."). No public concerns were voiced despite the "very extended public outreach." Ex. E, Russ Depo. at 64.

**2. Plaintiff's Termination**

Plaintiff oversaw the team of SPS employees and subcontractors (including Ms. Russ of AEGISS and Mr. Oskar Burger) working on the Conroe EA. Ex. B, Emerson Depo at 23–24. Plaintiff claims he raised concerns about the Conroe EA's legality. Complaint for Damages ("Compl.") ¶ 19, Dkt. 1. Plaintiff alleges that a properly completed EA typically requires 12–18 months. Compl. ¶ 18; Ex. A, Killgore Depo. at 107; *see also* Lyon Decl., Ex. F at 84 ("Russ Depo.") ("So including the DOPAA, six months would be considered pretty darn aggressive, expedited. A year would be considered kind of standard, including the DOPAA."). The USARC set a deadline of only three months to complete the Conroe EA. Lyon Decl., Ex. D ("Caballero Decl.") at 116; Ex. A, Killgore Depo. at 138.

Plaintiff argues this timeline was insufficient given the complexities associated with the Conroe site.[1] Ex. A, Killgore Depo. at 107. He felt that the three-month timeframe violated federal environmental laws and regulations, specifically the National Environmental Policy Act's ("NEPA") procedural requirements. He allegedly expressed this to his supervisors (Chief Caballero and Mr. Will Emerson). Ex. A, Killgore Depo. at 179–80. Plaintiff contends that he also told Chief Caballero that omission of the prior land use, *i.e.*, the helicopter hovering, violated NEPA. *Id.* at 201–02. The timeline, he argues, prevented him (and his team) from understanding

---

[1] The Army had not previously leased the property in Conroe. The leasing or consideration of leasing/acquiring property triggers the need to prepare an environmental report. Ex. F, Russ Depo. at 129.

the impact of the prior land use and undertaking the rigorous review process needed for a compliant EA, thereby violating NEPA's "hard look" requirement. Likewise, the failure to include a discussion or description of the prior land use violated both NEPA's hard look requirement and its "intent" and "spirit" of full disclosure.

According to Plaintiff, USARC refused to allow an extended EA timeline and actively instructed all personnel working on the EA to ignore and refrain from mentioning the prior helicopter use in any part of the EA, including in the DOPAA. *Id.* at 120–22 ("[T]his issue had to do with the transfer of the helicopter battalion from attack to assault. And . . . [Caballero] had directed [Plaintiff's] staff to remove all reference to the fact that this helicopter battalion had been operating on these parcels that we were to analyze . . . ."); Ex. F, Russ Depo. at 55–57, 61–62 (stating that Caballero instructed her to remove or refrain from referencing the past operations on the Conroe parcel); Lyon Decl., Ex. E ("Burger Depo.") at 48, 64, 66, 192–93, 195 ("And then we were told to remove that language completely . . . ."); Ex. D, Caballero Depo. at 62–63, 138 (stating she instructed Plaintiff and his team to remove references to the prior helicopter training from the Conroe EA). Chief Caballero also instructed Plaintiff to tell his team not to send emails or keep a written record of the prior use issues surrounding the Conroe EA. Ex. E, Burger Depo. at 80, 98; Ex. A, Killgore Depo. at 121–25. Any early drafts referring to the prior helicopter operations were edited to remove such references. Ex. D, Caballero Decl. at 63–64 ("I contacted them immediately and let them know that we were striking [helicopter references] from the DOPAA."). Even vague allusions to prior helicopter operations were forbidden and removed. Ex. E, Burger Depo. at 84, 102–03.

Plaintiff alleges that he repeatedly expressed his objections to Chief Caballero. Ex. D, Caballero Depo. at 73–76, 136–37; Ex. A, Killgore Depo. at 125–28, 258–59. He also reported the alleged NEPA noncompliance to his supervisor, Mr. Emerson, an SPS employee, on multiple occasions but was told to "do what the client asks." Ex. A, Killgore Depo. at 156–57; Ex. B, Emerson Depo. at 35–36 ("In the DOPAA [Plaintiff said] he thought that the previous helicopter training should be addressed."). Plaintiff thus argues that his objections were ignored. Ex. D,

Case No.: 5:18-cv-03413-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
4

United States District Court
Northern District of California

Caballero Depo. at 81, 135–37 (stating that when USARC decided about a project, the 63rd had to follow that decision, despite Plaintiff's protesting).

Despite being instructed to omit references of prior helicopter use, Mr. Burger, under Plaintiff's direction, submitted a draft of the DOPAA portion of the Conroe EA to the 63rd and the USARC that vaguely referenced the prior helicopter operations, which was a "serious breach of trust." Ex. D, Caballero Depo. at 77. Chief Caballero insisted the language be removed and reported the incident to Mr. Emerson. *Id.* at 64, 68–69, 77–78. Mr. Emerson instructed Plaintiff and Mr. Burger to apologize to Chief Caballero and approach her with a "yes" attitude as long as her directives were "legal, moral, and ethical." Ex. A at A-92.

On June 22, 2017, Chief Caballero met with Mr. Emerson and Dr. Steve Alexander (Plaintiff's SPS superiors) for a quarterly check-in meeting. Ex. D, Emerson Depo. at 81–82. Most of the meeting was spent discussing Plaintiff's performance. *Id.* at 84–85. Dr. Alexander referred to the meeting with Chief Caballero as "the worst client meeting" he had ever had. SJ Tran-Nguyen Decl., Ex. C ("Alexander Depo.") at 74. After this meeting, Mr. Emerson and Dr. Alexander determined Plaintiff had to be terminated for failure to meet company and customer expectations. Ex. D, Emerson Depo. at 80–81, 86.

**B. Procedural History**

Plaintiff originally filed his Complaint in state court. Defendant's removed the case to federal court alleging this Court has diversity jurisdiction over the case.[2] *See* Dkt. 1. On October 17, 2019, Defendant filed a motion for partial summary judgment as to Claims 1 and 4. Motion for Partial Summary Judgment ("MSJ"), Dkt. 33. On November 18, 2019, Plaintiff filed his Opposition. Opposition/Response re Motion for Partial Summary Judgment ("Opp."), Dkt. 37. Defendant filed its Reply on December 2, 2019. Reply re Motion for Partial Summary Judgment ("Reply"), Dkt. 38.

---

[2] Plaintiff does not contest that diversity jurisdiction exists and the Court sees no reason to question whether it has diversity jurisdiction. *See Ruhrgas AG v. Marathon Oil*, 526 U.S. 574, 583 (9th Cir. 1999) (noting federal courts have a duty to police subject-matter jurisdiction).

## II. LEGAL STANDARD

A court must grant summary judgment if the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to satisfy this burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Id.*

If the moving party meets its burden of production, the nonmoving party must produce evidence to support its claim or defense. *Id.* at 1103. If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, Rule 56(c) mandates the moving party win the motion for summary judgment. *See id.*

## III. DISCUSSION

### A. Overview of NEPA[3]

"NEPA is a procedural statute that requires the federal government to carefully consider the impacts of and alternatives to major environmental decisions." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) (citing 42 U.S.C. §§ 4321, 4331); *see also Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th

---

[3] Defendant requests this Court take judicial notice of Exhibit 1. *See* Defendant's Request for Judicial Notice ("RJN"), Dkt. 33-2. Exhibit 1 is a printout of a NEPA Guidance Document located on the Council on Environmental Quality ("CEQ") website. *Id.* at ECF 2. The Court may take judicial notice of a fact capable of accurate and ready determination by a source whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (finding court may take judicial notice of publicly accessible websites whose accuracy and authenticity is not subject to dispute). A court may consider facts contained in the noticed materials. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994).

Plaintiff does not object to the Court taking judicial notice of Exhibit 1. Further, judicial notice is proper because Exhibit 1 is a document on a publicly available, government-maintained website. Accordingly, Defendant's request for judicial notice is **GRANTED.**

Cir. 2008) ("Unlike the [Clean Water Act], NEPA does not contain substantive environmental standards, nor does the Act mandate that agencies achieve particular substantive environmental results."). NEPA ensures that federal agencies take a "hard look" at the environmental consequences of their proposed actions before deciding to proceed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989). Judicial review of agency decision-making under NEPA is limited to determining "whether the agency took a 'hard look' at the proposed action as required by a strict reading of NEPA's procedural requirements." *Bering Strait*, 524 F.3d at 947.

At issue in this case is USARC's decision to exclude information about prior land use from the Conroe EA. Hence, a past action is at issue. The Council on Environmental Quality ("CEQ") provides guidance on the extent to which agencies of the Federal Government are required to analyze the environmental effects of past actions. RJN, Ex. 1 at 1. The CEQ interprets NEPA and promulgates regulations. *Id.* Exhibit 1 is a CEQ guidance document which interprets NEPA and CEQ regulations regarding agencies requirement to consider past actions in their cumulative effects analysis. Importantly, "CEQ's interpretation of NEPA is entitled to substantial deference." *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979).

The environmental analysis required in NEPA is "forward-looking." RJN, Ex. 1 at 1. The effects of past actions—like the prior helicopter hovering—*may* warrant consideration in the agency's cumulative effects analysis. *Id.* Agencies should use "scoping" to focus on the extent to which information is relevant. *Id.* (citing 40 CFR 1502.22). Based on scoping, "*agencies have discretion* to determine whether, and to what extent, information about the specific nature, design, or present effects of a past action is useful for the agency's analysis." *Id.* (emphasis added). Agencies are not required to list or analyze the effects of individual past actions unless it is necessary to describe the cumulative effect of all past actions combined. *Id.* Notably, agencies retain substantial discretion as to the "extent of such inquiry and the appropriate level of explanation." *Id.*; *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376–77 (1989) (deferring to agency factual resolution because it "implicates substantial agency expertise"). "Generally, agencies can conduct an *adequate cumulative effects analysis* by focusing on the

current aggregate effects of past actions *without delving into the historical details of individual past actions*." RJN, Ex. 1 at 2 (emphasis added). Indeed, "[s]imply because information about past actions may be available or obtained with reasonable effort does not mean that it is relevant and necessary to inform decision making." *Id.* at 3. Accordingly, USARC retained "substantial discretion" in determining whether past activity was relevant for the Conroe EA.

**B. Violation of California Labor Code Section 1102.5**

California Labor Code Section 1102.5(b) prevents an employer from retaliating against an employee for disclosing information to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, if the employee has reasonable cause to believe that the information discloses a violation of a state, federal, or local law. California Labor Code Section 1102.5(c) prevents an employer from retaliating against an employee for refusing to "participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."

To establish a prima facie case for retaliation under Section 1102.5, an employee must show that (1) he engaged in protected activity, (2) he was thereafter subjected to an adverse employment action by his employer, and (3) there was a causal link between the protected activity and the adverse employment action. *Morgan v. Regents of the Univ. of Cal.*, 105 Cal. Rptr. 2d 652, 666 (Ct. App. 2000).

**1. Protected Activity Under Section 1102.5(b)**

"Protected activity" under Section 1102.5(b) requires: (1) a disclosure; (2) based on reasonably based suspicions; (3) of illegal activity. *Johnson v. Johns Hopkins Univ. Applied Physics Lab. LLC*, 2013 WL 4046668, at *6 (S.D. Cal. Aug. 8, 2013) (citing *Mokler v. Cty. of Orange*, 68 Cal. Rptr. 3d 568, 580 (Ct. App. 2007)). "To have a reasonably based suspicion of illegal activity, the employee must be able to point to some legal foundation for his suspicion—some statute, rule or regulation which may have been violated by the conduct he disclosed." *Turner v. City & Cty. of S.F.*, 892 F. Supp. 2d 1188, 1199–1200 (N.D. Cal. 2012) (citation

omitted). Plaintiff need only show a "genuine and reasonable concern" that USARC was engaged in unlawful activity to be protected as a whistleblower. *McVeigh v. Recology S.F.*, 152 Cal. Rptr. 3d 595, 608 (Ct. App. 2013). Plaintiff argues he engaged in protected activity by repeatedly disclosing to supervisors that the Conroe EA was being prepared in a manner that failed to comply with NEPA, Army Regulations, and other applicable laws.[4] Opp. at 13. The Court disagrees and holds that Plaintiff's expression of concern about the timeline did not amount to a "protected disclosure."

**a. Timeline to Complete the Conroe EA**

Defendant argues that Plaintiff failed to "blow the whistle" on a NEPA violation because Plaintiff's testimony indicates only that he told Mr. Emerson that the timeline was unreasonable, that he was concerned about the performance of his team in completing the Conroe EA, and that he questioned if completion "[was] even possible even in the best of circumstances." Mot. at 14; Ex. A, Killgore Depo. at 113. Likewise, Defendant notes that Plaintiff only told Chief Caballero that three months "probably" was not enough time to complete the EA. *Id.* at 124. Defendant argues Plaintiff's testimony shows that he merely expressed his "personal worries and reservations about whether SPS would be able to meet the deadline." Opp. at 14.

Notably, Ms. Russ, who agreed with Plaintiff that the timeline was unusually quick, testified that she never heard Plaintiff indicate that the timeline violated NEPA.

> Q: Did Mr. Killgore ever express concerns to you about the timeline to complete the Conroe EA?
>
> A: Not specifically that I can remember no.
>
> Q: What do you mean by "not specifically"?
>
> A: Well, I mean, honestly, we all laughed at it when we first heard it.

---

[4] Notably, Plaintiff fails to identify any other regulations or laws with specificity; instead he simply concludes "other laws" were violated. This is improper. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."); *see also Love v. Motion Indus., Inc.*, 309 F. Supp. 2d 1128, 1135 (N.D. Cal. 2004) (concluding that without citing to "any statute, rule or regulation," the plaintiff lacked any foundation for the reasonableness of his belief"). Plaintiff has only identified one law: NEPA. The Court thus focuses its analysis on NEPA.

> It was, you know, a little bit -- It was asking a lot you know. Like I said, it was doable, but -- No. I mean, he did not express specific concern or doubt that it could be done.
>
> Q: Okay. *And he never indicated or suggested that it was somehow illegal or it just couldn't be done in compliance with NEPA*?
>
> A: No.

Ex. F, Russ Depo. at 47 (emphasis added).

Plaintiff contends that he communicated his concerns about the timeline to Mr. Emerson and Chief Caballero and reasonably believed that the three-month timeline violated NEPA because it was insufficient for USARC to take a "hard look" at the potential environmental impact of the Conroe project. Opp. at 5, 14 ("[Plaintiff] told his supervisors that there would not be enough time to satisfy all of the procedural requirements of NEPA . . . in the time allotted and therefore SPS was engaged in an EA process that was not in compliance with NEPA and other applicable federal laws and/or regulations."). Plaintiff directs the Court to his deposition testimony for support. Ex. A, Killgore Depo. at 179. After reviewing this testimony and other parts of the record, the Court finds two issues with Plaintiff's theory that he "blew the whistle" on the "timeline violation."

*First*, Plaintiff provides this Court with no evidence that he told his supervisor, specifically Chief Caballero, that the rushed timeline constituted a NEPA violation. Pursuant to Section 1102.5(b), any "whistleblowing" must be made to a "government or law enforcement agency" *or* to someone with "authority" over the employee who has the power to "investigate, discover, or correct the violation of noncompliance." Defendant is a private environmental compliance firm, not a "government or law enforcement agency." Plaintiff does not argue to the contrary. Further, Mr. Emerson, an SPS employee, with authority over Plaintiff, lacks the power to correct the USARC's alleged noncompliance. Indeed, Mr. Emerson, a private citizen, cannot compel or force the USARC to do something it has chosen not to do. Accordingly, the Court looks only to what Plaintiff told Chief Caballero as his statements to Mr. Emerson are irrelevant under 1102.5(b).

Page 179 of Plaintiff's deposition testimony details what Plaintiff told *Mr. Emerson* about the Conroe EA. Ex. A, Killore Depo. at 179. The conversation between Plaintiff and Mr.

Emerson fails to show that Plaintiff complained of illegal activity to Chief Caballero, especially because Mr. Emerson and Plaintiff barely discussed Chief Caballero. *See id.* (mentioning only that Chief Caballero reported to Mr. Emerson that Plaintiff was "pushing back" on the Conroe EA); *see also id.* at 113 ("[A]fter I had communicated with Will Emerson that that timeline was unreasonable . . . ."). A conversation with Mr. Emerson about an alleged violation of law is insufficient as a matter of law to establish a whistleblower violation. Problematically, Plaintiff's briefing and Complaint focuses largely on what he told Mr. Emerson. *See* Plaintiff's Separate Statement of Disputed and Additional Material Facts and Conclusions of Law, Dkt. 37-1.

Looking to what Plaintiff actually told Chief Caballero: in May 2017, Plaintiff testified he told Chief Caballero that "there's no way that we can do this in three months. It probably isn't even possible to do this in 18 months." *Id.* at 124. The Court cannot locate, and Plaintiff does not provide, any other testimony in which Plaintiff either expressly tells Chief Caballero that the timeline violates NEPA's "hard look" review or implicitly suggests it does. *Cf. id.* at 137 (highlighting more evidence for Plaintiff's second theory of non-compliance, lack of prior history in the EA, as Plaintiff states he and Ms. Russ expressed to Chief Caballero it was "not legal to -- to create [the Conroe EA] without the analysis [of the prior operations]"). Concern about meeting a deadline, as exists here, is not protected activity. Without more, it does not disclose a legal violation. *See Love*, 309 F. Supp. 2d at 1134 (finding the plaintiff failed to show protected activity because the disclosed activity did not violate any law). A contrary finding would render the whistleblower statute limitless; anytime an employee disagreed with a deadline, they could have a whistleblower claim. This is antithetical to California courts interpretation of the statute. *See Patten v. Grant Joint Union High Sch. Dist.*, 37 Cal. Rptr. 3d 113, 118 (Ct. App. 2005) (noting judiciary need to police boundaries of California whistleblower statute so as to not "thrust the judiciary into micromanaging employment practices"). Accordingly, because Plaintiff has only provided facts that he told Chief Caballero of his concern with meeting the deadline but not that he expressed concern over the legality of the deadline, he has not met his burden of showing he engaged in protected activity.

*Second*, the disclosures made by Plaintiff were part of his "normal duties" and thus are not entitled to whistleblower protection. An employee's communications can fall into three categories: (1) disclosures made as part of normal duties through normal channels, (2) disclosures made as part of normal duties outside of normal channels, and (3) disclosures made outside of normal or assigned duties. *Id.* at 725. Only the latter two categories qualify as protected disclosures. *Id.* Plaintiff's communications to Chief Caballero do not qualify as protected disclosures because the communications were part of his normal duties and were made through normal channels. Chief Caballero was his supervisor; his "normal channel" was to report to her. Ex. A, Killgore Depo. at 179–80. Plaintiff's duties at SPS, and for the 63rd, were "environmental compliance." *See* Ex. A, Dkt. 37-2 at ECF 95 (Plaintiff's resume). Accordingly, any disclosures to Chief Caballero about the EA timeline being non-compliant with NEPA were part of Plaintiff's "normal duties to ensure 'compliance with [environmental regulations]'" and are unprotected by 1102.5(b). *Manavian v. DOJ*, 239 Cal. Rptr. 3d 710, 725 (Ct. App. 2018). As noted by California courts interpreting Section 1102.5(b), "[n]ot every 'thought, suggestion, or discussion of an action that someone might consider to be a violation of a law, rule, or regulation is a justification for a whistleblower complaint. Discussion among employees and supervisors concerning various possible courses of action is healthy and normal . . . . [and] may in fact avoid a violation.'" *Id.* at 726 (emphasis omitted) (quoting *Mize-Kurzman v. Marin Cmty. College Dist.*, 136 Cal. Rptr. 3d 259, 282 (Ct. App. 2012)).

In an attempt to escape these findings, Plaintiff cites to *Ross v. County of Riverside*, 248 Cal. Rptr. 3d 696 (Ct. App. 2019). Opp. at 18. There, the plaintiff, a district attorney, recommended that his supervisors dismiss a homicide case after he uncovered DNA evidence exculpating the defendant and obtained a confession from another witness admitting to the murder. *Ross*, 248 Cal. Rptr. 3d at 699–700. The plaintiff's boss told him not to turn over the exculpatory evidence to defense counsel and became upset when the plaintiff informed his boss that he already had turned over the evidence. *Id.* at 700. The plaintiff was subsequently terminated and sued the County of Riverside for wrongful termination under Section 1102.5(b). *Id.* at 704. The court

concluded that a triable issue of fact existed as to the question of whether the plaintiff engaged in protected activity. *Id.* at 704–05. The court based its determination on two things: (1) contrary to the defendant's argument that the plaintiff had to specifically identify in his disclosures the legal violation, Section 1102.5(b) does not require a whistleblower to "expressly state in [their] disclosures" which law they believe is being violated. The employee must only disclose information that they reasonably believe discloses unlawful activity and (2) the plaintiff's disclosure "should have raised the same constitutional, statutory, and ethical concerns" to the plaintiff's superiors since all prosecutors are constrained by the same legal and ethical standards. *Id.* at 705.

This case is different from *Ross*. First, even while an employee's disclosure needs not expressly state the legal violation, it must provide sufficient detail such that the disclosure identifies the supposed legal violation. For instance, in *Ross*, the plaintiff "provided evidence showing he disclosed information to his superiors indicating the district attorney's office would not be able to prove a particular murder case beyond a reasonable doubt and lacked probable cause to continue prosecuting" the case. *Id.* The disclosure was thus plainly rooted in prosecutor's ethical and legal obligations. Here, however, Plaintiff provides no testimony indicating that he told Chief Caballero the root of his concerns. He only provides evidence that he was concerned about the timeline. *See supra*.

Moreover, in *Ross*, the plaintiff's disclosure of exculpatory evidence to his superiors clearly implicated his and their duties under California law (and possibly federal law like *Brady v. Maryland*, 373 U.S. 83) to cease prosecution once the prosecutor knows a charge is not supported by probable cause. *Id.* at 705. Hence, in *Ross*, there was no question that by ordering the plaintiff to suppress evidence and continue prosecuting the accused, a legal violation would result. In contrast, here, agencies have vast discretion over how much time an EA should receive and what information should be included in an EA. *See supra* III.A. Plaintiff's expressions of concern regarding the timeline thus are more analogous to unprotected "business discussions." *See Manavian*, 239 Cal. Rptr. 3d at 726 (noting that not all employee-employer discussions of legality

are protected disclosures).

Accordingly, Plaintiff has not provided evidence showing that a genuine dispute of material fact exists as to whether his timeline disclosures are protected by Section 1102.5(b) and Defendant's motion for partial summary judgment is **GRANTED** as to this claim.

**b. Failure to Discuss Past Operations in Conroe EA**

Plaintiff next claims that he reasonably believed the Conroe EA violated NEPA because the report did not discuss the prior helicopter hovering and its impact on noise, air quality, airspace management and safety or its environmental consequences on earth, biological, and cultural resources. Opp. at 7. He argues the decision to exclude consideration of and reference to the prior operations at Conroe violated NEPA's "hard look" requirement and its "intent" and "spirit" of full disclosure to the public. *Id.* As noted in the factual background, Chief Caballero instructed Plaintiff and his team to exclude any mention of the prior helicopter activity in emails, written correspondence, and the Conroe EA. Plaintiff "repeatedly expressed [his] objections to Ms. Caballero." Opp. at 8

There are two issues with Plaintiff's claim that he "blew the whistle" about the exclusion of the prior helicopter operations from the Conroe EA: (1) Plaintiff did not make a "disclosure" within the meaning of Section 1102.5(b) and (2) agencies retain substantial discretion over whether to include a discussion about past land use in an EA.

*First*, in order to be protected by Section 1102.5(b), the whistleblower must make a "disclosure." *See, e.g.*, *Mize-Kurman*, 136 Cal. Rptr. at 281–82. "[T]he report of information that was already known did not constitute a protected disclosure." *Id.* at 281 (citing *Meuwissen v. Dep't of Interior*, 234 F.3d 9, 12–13 (Fed. Cir. 2000)). The term "disclosure" means to "reveal something that was hidden and not known." *Id.* "This conclusion is consistent with those cases holding that the employee's report to the employee's supervisor *about the supervisor's own wrongdoing* is not a 'disclosure' and is not protected whistleblowing activity, because the employer *already knows* about his or her wrongdoing." *Id.* at 282 (first emphasis added) (collecting cases). Indeed, criticism delivered to the wrongdoer does not further the purpose of

California whistleblower laws because it fails "to encourage disclosure of wrongdoing to persons who may be in a position to remedy it." *Id.* Thus, implicit in the whistleblower statute is the concern that employees not be terminated for reporting a violation to someone they believe can do something about the violation, *i.e.*, someone the employee thinks does not already know about it.

Plaintiff alleges that he blew the whistle to Chief Caballero, his supervisor. Simultaneously, however, Plaintiff argues Chief Caballero personally engaged in the illegal act of suppressing information of the prior land use. In other words, Plaintiff fails to allege and prove that Chief Caballero never knew about the illegal suppression. Indeed, Plaintiff contends Chief Caballero not only knew that the Conroe EA failed to disclose the prior land use, but that she actively sought to prevent Plaintiff and Plaintiff's team from mentioning the prior use. Hence, Plaintiff's disclosure to Chief Caballero is not protected under 1102.5(b) because California law requires the report be made to a "superior . . . [who] is not the person involved in the alleged wrongdoing." *Id.*

Plaintiff argues *Mize-Kurman* does prevent Section 1102.5(b) from protecting the disclosure of known information. Opp. at 12. He cites *Hager v. County of Los Angeles*, 176 Cal. Rptr. 3d 268 (Ct. App. 2014) as support. But, *Hager*'s analysis of *Mize-Kurman* never says "disclosure" of known information is protected. To the contrary, *Hager* concluded only that *Mize-Kurman* did not announce a "first to report" rule. 176 Cal. Rptr. at 276 ("Consistent with federal law, the *Mize-Kurzman* court held reporting information that already was known to the employer did not constitute a protected disclosure. . . . No [] 'first report' limitation was discussed in *Mize-Kurzman*."). *Hager* and *Mize-Kurzman* thus both concern situations where an employee discloses a legal violation *to someone who does not already know about it.* A contrary finding would make the whistleblower statute limitless and render the "disclosure" requirement meaningless. *See Patten*, 37 Cal. Rptr. 3d at 118 (noting whistleblower statute should not "thrust the judiciary into micromanaging employment practices."). Thus, because Chief Caballero already knew about the alleged illegal omission of prior land use, Plaintiff did not "disclose" anything to her within the meaning of Section 1102.5(b).

*Second*, as Defendant notes, pursuant to CEQ guidelines, USARC had significant discretion to determine "whether, and to what extent, information about the specific nature, design, or present effects of [the past helicopter operation] is useful for the agency's analysis." RJN, Ex. 1 at 1. Because the EA required for NEPA is "forward looking," it need only assess the potential impacts of a proposed action. *Id.* Plaintiff, and his counsel at oral argument, points this Court to *Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*, 387 F.3d 989 (9th Cir. 2004) to argue that USARC had a legal duty to discuss the past helicopter hovering in the Conroe EA. Opp. at 14. This mischaracterizes *Klamath*. *Klamath* discussed an agencies requirement to consider cumulative impacts in an EA and held that, under NEPA, an EA must "sufficiently identify or discuss the *incremental impact* that *can be* expected from [later sales] or how *those* individual impacts might combine or synergistically interact with each other to affect the [] environment." 387 F.3d at 997 (emphasis added). As this quotation and the emphases added show, *Klamath* is consistent with NEPA being a "forward looking" statute. *Klamath* discusses an agencies requirement to discuss *future* cumulative impact of a proposed action. It does not discuss an agency's requirement to consider *past* action. Plaintiff's attempt to confuse the issue is rejected. The Court holds, consistent with NEPA, CEQ guidance, and *Klamath*, agencies have substantial discretion over whether to include *past* actions in their EAs and what extent those past actions should be discussed in a cumulative effects analysis.

While Section 1102.5 does not require an employee's disclosure to expressly state the alleged legal violation, it *does* require that the employee "reasonably believe the information discloses unlawful activity." *Ross*, 248 Cal. Rptr. 3d at 593. Plaintiff had prior NEPA experience:

> Q: At the time you started your employment with SpecPro, did you have any prior experience writing environmental assessments or EAs?
>
> A: Not for a consulting firm like SpecPro.
>
> Q: So you did have prior experience writing an EA for him?
>
> A: So my experience with NEPA documentation, including environmental assessments, involved the analysis of these documents, analyzing the writing, participating in NEPA, and understanding the

United States District Court
Northern District of California

> regulatory implications of these documents.
>
> Q: And for whom did you perform what you just described?
>
> A: Marstel-Day, Oregon Natural Desert Association.

Ex. A, Killgore Depo. at 68. Indeed, while Plaintiff had never written an EA before starting his employment with Defendant, he had experience with the EA writing process. *Id.* at 71.

> Q: At the time you started your employment with Specpro, did you have any prior experience writing environmental impact studies?
>
> A: The -- with the Oregon Natural Desert Association, my job responsibilities were to analyze environmental impact statements and environmental assessments and understand their legal implications, participate in the NEPA process through the outreach process. And with Marstel-Day, it was a similar type of engagement in the NEPA process.

*Id.* As Plaintiff notes in his resume, he was responsible for "environmental compliance" for Defendant's clients. *Id.* at ECF 95.

This is all to say, Plaintiff understood NEPA's requirements and any regulations promulgated under it. He knew about the substantial discretion an agency receives in deciding whether to include past land uses in an EA and that the agency is not required to include past land uses if it finds it unnecessary. *See* RJN, Ex. 1 at 1. He also understood that NEPA does not require an agency to "adopt any particular internal decisionmaking structure." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 100 (1983); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."). Accordingly, it is unreasonable for Plaintiff to believe he engaged in protected activity by disclosing to Chief Caballero that the Conroe EA failed to discuss the prior use of the land when he knew (or should have known given his experience) that the agency had substantial discretion over the decision about whether to include past uses.

Accordingly, because Plaintiff neither "disclosed" information nor could have "reasonably believed" the information disclosed constituted a legal violation, Defendant's motion for summary judgment is **GRANTED** as to the prior land use claim.

**2. Protected Activity Under Section 1102.5(c)**

Section 1102.5(c) states: "An employer, or any person acting on behalf of the employer, shall not retaliate against an employee *for refusing to participate in an activity that would result in a violation of state or federal statute*, or a violation of or noncompliance with a local, state, or federal rule or regulation." (emphasis added). This section protects employees who "refuse to act at the direction of their employer or refuse to participate in activities of an employer that would result in a violation of law." *Casissa v. First Republic Bank*, 2012 WL 3020193, at *8 (N.D. Cal. July 24, 2012). "Refuse" is accorded its plain meaning. It requires "that an employee asked to perform an act stated that he would not perform the act and/or did not perform the act." *Scheu v. Charter Commc'ns, LLC*, 2011 WL 3204672, at *21 (C.D. Cal. July 27, 2011).

Plaintiff argues Defendant's violated Section 1102.5(c) because "insistence that a report, void of necessary information, should be redone, could constitute protected activity under 1102.5(c)." Opp. at 18–19. This misconstrues Section 1102.5(c); mere reporting of a violation is insufficient. To survive summary judgment, the employee must show a genuine dispute of material fact over whether they *refused* to engage in illegal activity. As Defendant notes, Plaintiff has not established refusal. To the contrary:

> Q: Did you at any point ever *refuse* to comply with Ms. Caballero's directives to complete the Conroe EA within three months?
>
> . . . .[5]
>
> A: *I didn't directly refuse*. I raised extensive concerns with the completion of the document and told her that we had members of the teams that were extremely concerned about it and relayed those concerns and --
>
> Q: Did you ever tell her that you refused to complete the Conroe EA within three months?
>
> . . . .
>
> A: I think it was clear based on our concerns and based on -- concerns raised before we even got into the writing of the document from both Oskar and myself that we felt like it was not possible to complete

[5] Throughout this block quote, these ellipses refer to omitted objections.

them given the issues that we were aware of.

Q: Did you ever tell her that you refused to make the efforts necessary to get the Conroe EA completed within three months?

. . . .

A: I felt like our conversations were clear.

Q: Did you ever tell her, No, I'm not going to do it?

. . . .

A: *I didn't have a chance before I was terminated.*

Ex. A, Killgore Depo. at 228–29 (emphasis added). Plaintiff also testified that he "continued to work on the document to the day [he] was fired." *Id.* at 231.

Thus, as a matter of law, Plaintiff cannot show that he refused to work on the Conroe EA or that he refused to complete the project within three months. Indeed, Plaintiff worked on it up until he was terminated, which plainly shows he did not "refuse to participate in an activity that would result in a violation of" law. Accordingly, he cannot maintain his Section 1102.5(c) action and Defendant's motion for summary judgment as to this claim is **GRANTED.**

**C. Violation of California Labor Code Section 1102.6**

Section 1102.6 is a burden shifting statute. It is not at issue because, as established, Defendant has shown no genuine dispute of material fact exists as to Plaintiff's 1102.5 claim. The Court thus does not reach any arguments regarding Section 1102.6.

**D. Wrongful Termination in Violation of Public Policies**

Plaintiff's wrongful termination in violation of public policy claim is premised on his whistleblower retaliation claim. Compl. ¶ 57. Plaintiff's whistleblower retaliation claim fails as a matter of law. Thus, his wrongful termination in violation of public policy cause of action also fails. Defendant's motion for summary judgment as to this claim is **GRANTED.**

**E. Punitive Damages**

Finally, Defendant asks this Court to hold that Plaintiff is not entitled to punitive damages. Mot. at 25. Plaintiff's request for punitive damages is rooted in his first and fourth causes of action. *See* Compl. ¶¶ 40, 59. Because these claims are dismissed from the action, punitive

damages are no longer pleaded. The Court thus **GRANTS** Defendant's punitive damages request.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment is **GRANTED** and Plaintiff's whistleblower (count 1) and wrongful termination in violation of public policy (count 4) claims are **DISMISSED with prejudice.** Nothing in this Order should be construed as affecting Counts 2 and 3.

**IT IS SO ORDERED.**

Dated: December 19, 2019

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California

Case No.: 5:18-cv-03413-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
20